Filed 11/27/18; Certified for Publication 12/19/18 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KILEIGH CARRINGTON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STARBUCKS CORPORATION,<br><br>    Defendant and Appellant. | D072392<br><br><br>(Super. Ct. No. 37-2014-00018637-<br> CU-OE-CTL ) |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Akin, Gump, Strauss, Hauer & Feld, Jonathan P. Slowik, Gregory W. Knopp, and Rex S. Heinke for Defendant and Appellant.

Sullivan Law Group, Eric K. Yaeckel, William B. Sullivan, and Andrea J. Torres-Figueroa for Plaintiff and Respondent.

Kileigh Carrington filed a complaint against her former employer, Starbucks Corporation, asserting a representative cause of action under the Private Attorney General

Act (PAGA) (Labor Code, § 2698 et seq.),[1] claiming Starbucks failed to properly provide meal breaks or pay meal period premiums for certain employees in violation of sections 226.7 and 512. In a bifurcated bench trial on plaintiff's action, the trial court determined Starbucks was liable for these violations and imposed penalties of $150,000, with 75 percent thereof payable to the Labor and Workforce Development Agency (LWDA) and 25 percent payable to Carrington and the employees she represented in the action. The trial court entered judgment in Carrington's favor. Starbucks appeals, contending Carrington failed to prove she is an aggrieved employee and failed to prove a representative claim. We conclude there was no legal error and find that substantial evidence supports the judgment; accordingly, we affirm.

BACKGROUND

I.      *Complaint*

In her complaint, Carrington alleged that Starbucks implemented a meal period policy under which employees who worked slightly more than five hours were not provided meal breaks within the first five hours of work and were not paid meal period premiums when meal breaks were not timely provided, in violation of sections 512, subdivision (a), and 226.7, subdivisions (a) and (b). As a result, Starbucks failed to provide accurate itemized wage statements in violation of section 226 and failed to provide employees with all wages earned and unpaid at termination in violation of sections 201, 202, and 203. Carrington sought civil penalties and unpaid wages under

---

[1]      All statutory references are to the Labor Code unless otherwise specified.

2

sections 2699, subdivision (a), and 558, subdivision (a), and an award of attorney fees and costs under section 2699, subdivision (g)(1). Carrington attached to her complaint two letters she previously sent to the LWDA and Starbucks providing written notice of her claims, as required under section 2699.3, subdivision (a)(1).

II.     *Starbucks's Summary Judgment Motions*

Starbucks moved for summary judgment on Carrington's claims, arguing that Carrington's meal break claim failed because, although her time records reflected she twice started a break after working more than five hours and was not paid a meal premium, Carrington could not recall the details surrounding those shifts, including which supervisors or managers were working or why she did not begin her breaks until more than five hours had elapsed. Starbucks argued that her lack of memory regarding the specific instances of these shifts, coupled with Starbucks's policy to provide employees scheduled to work shifts longer than five hours with compliant meal periods, indicated summary judgment should be awarded in Starbucks's favor. The court denied summary judgment, finding that Carrington created triable issues as to whether Starbucks failed to provide timely meal breaks with her declarations that Starbucks's standard policy was that no one could take a break without receiving permission and her manager or shift supervisor always dictated when she could take a break.

Starbucks subsequently filed a "motion regarding trial of representative claim," contending a representative PAGA action was not appropriate because no uniform policy or practice could explain why employees took a late break; as such, individualized inquiries into each late meal break were required. Starbucks submitted more than 100

3

declarations from various California employees in support of this motion. The court denied the motion, finding it was one "for summary judgment or adjudication in disguise," and Starbucks had failed to comply with the procedural requirements for summary judgment motions. (See, e.g., Code Civ. Proc., § 437c.)

III.   *Trial*

A. *Carrington's Case*

1. *Starbucks's Person Most Knowledgeable*

Carrington's primary witness at trial was Maryann J., Starbucks's vice president of partner resources[2] for the retail operations, west division, whom Starbucks had previously designated as its person most knowledgeable on Starbucks's meal period policies and practices applicable in California. (See Code Civ. Proc., § 2025.230.)

Maryann testified that partners are required to document their daily time by punching or clocking in and out at the start and end of their shifts, and at the start and end of their breaks, using either the store's point of service system (cash register) or the manager's back office laptop. Starbucks retains records documenting the employees' punches. Maryann testified that these records were tied to each partner's partner number and would accurately reflect each partner's punches in and out of the system.

Store managers were authorized to edit partners' time records and used a "punch communication log" to document any such changes. These changes are incorporated into the time records retained by Starbucks.

---

[2]     Starbucks refers to its nonexempt employees as "partners."

4

Maryann testified that, during the limitations period, Starbucks used two different computerized scheduling systems to schedule partner shifts: the ALS and GLS systems. The GLS system was the primary system Starbucks used to create work schedules. Maryann explained that the "system will generate meal breaks on the schedule if a partner is scheduled more than five hours." The meal breaks will always be scheduled to start before the beginning of the fifth hour.[3] Maryann testified that the scheduling system will not schedule a meal break for a partner scheduled to work exactly five hours or less in a workday.[4] She admitted that there are occasions when a store partner is scheduled to work less than five hours but ultimately works more than five hours. On such occasions, the computerized scheduling system does not schedule a meal period.

Maryann testified that Starbucks uses the computerized scheduling system to generate "daily coverage reports" which are posted in stores to communicate to partners when they should take breaks. There is no other documentation provided to the partners to give them notice of a scheduled meal period. Maryann testified that, ordinarily, a store manager would print out a daily coverage report and the shift supervisor would put it on a clipboard, modifying it throughout the day to record adjustments to the day's schedule.

---

[3]    Maryann testified that partners are entitled to a timely meal break.

[4]    Whether meal periods were automatically scheduled for employees scheduled to work exactly five hours was disputed. Starbucks subsequently elicited testimony from a systems support employee who testified that Starbucks's scheduling system would automatically schedule a meal period for a shift of exactly five hours. Starbucks's partner resources manager testified she did not know.

As modified, the daily coverage reports remained within the individual stores; Starbucks maintains no formal record of any changes.

Maryann confirmed that the "partner guide" Starbucks provides to every newly-hired partner states, " 'All partners in nonexempt jobs receive an uninterrupted, 30-minute meal break if scheduled to work a shift of a minimum duration.' "  She explained that, in California, a shift of minimum duration is a work shift scheduled to be in excess of five hours.  She stated that "[a] shift scheduled to be five hours directly would not be eligible for a meal break period."

Maryann confirmed that Starbucks's "partner resources manual"—a reference guide provided to managers to provide them with in-depth explanations of Starbucks's policies—similarly provided, " '[a]n unpaid . . . uninterrupted meal break of 30 minutes' duration will be provided to each nonexempt partner . . . if scheduled to work a shift of minimum duration.' "  Maryann acknowledged that a partner's meal period could be impacted in a number of circumstances, such as a sudden customer rush or a store partner calling in sick for a scheduled shift.  In instances where a partner's meal break was required to be cut short, Starbucks's policy was to either provide the partner with a "proper" meal break or pay a meal break premium.[5]

Maryann testified that Starbucks provided its California store managers with the "SM 100 Partner Resources Practices California Work Rules Supplement" as a training

---

[5]     Maryann testified that Starbucks interchangeably uses the terms "meal period premium" and "meal period penalty" to refer to the compensation a partner would be owed if he or she was not timely provided a meal break.  (§ 226.7, subd. (b).)  In payroll reports, this compensation was denominated a "break premium."

tool with respect to the company's California-specific meal period policies and practices.

That document states the following policies:

> "The following circumstances will result in payment of a break penalty:
>
> [¶] . . . [¶]
>
> "The partner is scheduled for a shift of five (5) hours or less, but is directed by a shift supervisor, assistant store manager, or store manager to work more than five hours and the partner is not provided a meal break before the end of the fifth hour.
>
> "The following circumstances will <u>not</u> result in payment of a break penalty:
>
> [¶] . . . [¶]
>
> "The partner is scheduled to work a shift of five (5) hours or less, is not scheduled for a meal break, and is not directed by a manager to work more than five hours, but the actual hours worked are *slightly more* than five (5) hours because of punching in slightly early or punching out slightly late."  (Italics added.)

Carrington referred to this written policy as the "slightly more" policy.[6]  The

following exchange occurred:

> "Q.  Now, the slightly more policy and practice allows the store managers to refuse to pay a meal period premium where certain events have occurred, correct?
>
> "A.  It provides them with an example of when they wouldn't pay a premium, yes."

Maryann testified that partners would not be allowed to ignore their scheduled

break time and take a meal break at another time:  "They should follow whatever is on

---

6    Carrington also used the term "slightly more" to identify the category of work shifts at issue in the action with an initial or total duration of between five hours and one minute (5:01) and five hours and 14 minutes (5:14), that is, "slightly more" than five hours.

the [daily coverage report] unless they're—unless they make an agreement with their manager or shift to adjust."[7] Partners were not permitted to waive their meal breaks.

In the event a partner's time report indicated the partner punched out after his or her scheduled punch-out time, the store manager was responsible for having a conversation with the partner to determine what caused the untimely punch out and to determine, on a case-by-case basis, whether a meal period or a meal period premium was warranted.

Starbucks's computer scheduling system enabled managers to generate meal break premium reports listing every shift for which a potential meal break premium should be paid. Maryann testified managers were expected to generate this report weekly, each time they ran payroll. In response to this report, the manager should "[h]ave a conversation with the partner, look at the punch communication logs, have a conversation with the shift, figure out what happened on that day to be able to determine if the—the meal premium should be paid based on a work-related reason or if it was in error."

The following exchange occurred:

"Q. If a store partner works an initial work shift in excess of five hours without a meal period, would Starbucks's practice provide them with a meal period premium?

"A. They should be provided with a break or a premium."

Maryann stated that Starbucks's policy was for a partner to be paid for all time worked, even if that time was not authorized in advance. Maryann explained:

---

7   "Shift" in this instance appears to refer to a shift supervisor, who worked under the store manager to supervise partners.

"A. Our expectation would be that if a partner works more than five hours, they get either a premium or they get their break.

"Q. Even if they weren't scheduled for one?

"A. Yeah. I mean, if it's work related, then absolutely."

However, Maryann repeatedly noted that supervisors should talk to partners to determine the reason the partners worked beyond their scheduled shift, and that the decision to pay a premium is ultimately left to the store manager's discretion. Summarizing this line of questioning, Maryann was asked: "Okay. Okay. Let me try to short-circuit it. I believe what you're saying is that the ultimate decision on whether to provide a meal break penalty comes down to the store manager, correct?" Maryann responded: "They are the decisionmaker, yes."[8] Maryann also noted that Starbucks "headquarters" would not be involved in overseeing these daily discussions between managers and partners on whether a meal premium was due.

Maryann acknowledged that Starbucks had changed its policies relating to shifts just over five hours in October 2015 (after plaintiff sent her initial PAGA notice), eliminating the "slightly more" policy.

---

[8] Maryann provided an example where it would be appropriate not to pay a meal period premium: "The first thing that comes to my mind is if a partner was scheduled to work, say, five hours, right, just right up to the minute, and at the end of their shift they decided to make a partner beverage for themselves rather than going to clock out, and it took them longer than they thought, and they clocked out at 5:01 or 5:02. [¶] So that could be an example of where the partner would say, 'Hey, you know, I forgot'—'I made the beverage before I clocked out, so, you know, I would agree to not be paid a penalty and/or take a break.' "

9

### 2. *Carrington*

Carrington was employed by Starbucks as a barista between approximately August 2013 and December 2013. She trained briefly at two different San Diego-area stores before beginning her employment at the newly opened West Point Loma Boulevard store.

Her time records reflect that during her employment with Starbucks, she worked 41 shifts. During at least two of these shifts, Carrington started a meal period after working more than five hours and did not receive a premium payment.

Carrington testified that she accurately recorded her work time while employed at Starbucks. She was familiar with the daily coverage report but testified she did not necessarily see it during each shift because it was not always posted in the same place; it would "move around." Her shift supervisor or manager on duty would tell her when her break was; she knew her breaks were typically scheduled around the three- to four-hour point into her shift.

She was required to obtain approval from her shift supervisor or manager prior to beginning her meal periods:

> "Q. Do you recall whether you were required to wait for a shift supervisor's instruction before you started the meal period?
>
> "A. Oh, yeah. I wouldn't just clock out and go. It would be a discussion between them and I when to clock in or clock out. Just because of coverage reasons, you can't leave your position just unattended."

Carrington never refused to begin a meal period when instructed to do so. Once instructed to start a meal break, she would "immediately" punch out to start the break.

10

Carrington never delayed in punching out to make herself a partner beverage. Given the store's layout, Carrington said it was not possible that it would take three minutes between the time she was instructed by a store manager to punch out, and the time she actually punched out. She does not recall ever having discussions with her manager or anyone else about voluntarily delaying a meal break, and she never voluntarily delayed taking a meal break.

Carrington would work past the end of her scheduled shift "a lot of times," at the request of her supervisor, when the store was busy and coverage was needed. Carrington did not specifically remember the circumstances of the days when she was not afforded a break until after the beginning of her fifth hour of work. She testified she never complained about having a late meal break because "people would get backed up on breaks because we would get so busy. So we were all in it together, you know. So all—I never—I never complained. I just kept working, as directed."

### 3. *Carrington's Expert Witness*

Carrington retained a statistician to provide expert witness testimony. He was asked to determine the number of shifts and pay periods containing either initial shift segments or total uninterrupted shift lengths of between five hours and one minute (5:01) through five hours and 14 minutes (5:14). He analyzed data from 8.3 million shifts and determined that there were over 133,000 shifts (1.6 percent) with this duration. Of these shifts, nearly 102,000 (76 percent) did not result in a meal break penalty payment. Carrington's expert testified that his analysis was validated by the analysis of Starbucks's

11

expert, who opined that 74 percent of shifts slightly in excess of five hours did not receive a meal break penalty.

B. *Starbucks's Case*

1. *Starbucks's "Partner Resources Manager"*

Starbucks called Dora R., its "partner resources manager," who performs human resources services for Starbucks, including training new managers on Starbucks's California meal break policies and practices. Dora testified that Starbucks's policy is "that any partner who's scheduled for a shift of more than five hours is entitled and will be scheduled for a meal break." Starbucks's automated time system schedules meal breaks automatically into the daily schedules. For partners scheduled for shifts of less than five hours' duration, meal breaks are not automatically scheduled. If a partner with a shift scheduled for less than five hours' duration needs to work longer than five hours, their shift supervisor must either schedule a meal break for them (by writing it into the daily schedule) or "award[] the one-hour penalty."

The store manager is ultimately responsible for the decision whether to pay the partner a meal period premium. The store managers are trained to talk to the store partners before making these decisions, but Dora explained that Starbucks is not able to ensure these conversations occur "in every situation" given the number of stores and partners. Dora testified that Starbucks does not require store managers to document—on the daily coverage reports—that they investigated to determine whether a meal break should have been scheduled or a meal break premium paid. However, Dora later stated that if a partner's time report reflected a missed meal break, or a meal break that was not

timely provided, the store manager should record the reason why in a "meal break analysis report":

> "Q. Does Starbucks retain the meal break analysis reports?
>
> "A. Yes.
>
> "Q. And within those meal break analysis reports, it's true that the manager should record the reason why each partner's time worked reflects a missed meal break?
>
> "A. Yes, they should.
>
> "Q. Okay. And that also includes where a timely meal break has been missed, correct?
>
> "A. Correct."[9]

### 2. *Starbucks's Expert*

Starbucks retained an expert witness who analyzed over 5.7 million shift records from 27,146 employees in 490 stores, purportedly representing 25 percent of California stores. Of those shifts, only 0.61 percent had first segment durations between five hours, one minute (5:01) and five hours, six minutes (5:06), and 0.31 percent of all shifts had total shift durations between five hours, one minute (5:01) and five hours, six minutes (5:06). Analyzing only this small subset of shifts (total or first segment durations of

---

[9] It does not appear that any "meal break analysis reports" were introduced as evidence at trial.

5:01-5:06), he concluded that meal period penalties were paid in 26 percent of these shifts.[10]

Starbucks's expert testified that there was no information in the data to identify whether an employee had the opportunity to take a meal and chose not to do so: "it's not as though there is a flag on the data that says, you know, 'I took the—I had the opportunity, but I waived a meal.'" He further testified his data analysis indicated "there is a statistically significant variation between store managers" meaning, "there are some store managers . . . that maybe never pay a meal premium [to partners who worked a shift or shift segment of 5:01-5:06 but did not take a meal break]. There are others that always pay a meal period premium."

### 3. *Starbucks's Systems Engineer*

Starbucks elicited testimony from Holly K., a systems engineer who provided support for the company's GLS system. She testified that the GLS system is designed to automatically populate schedules with a duration of five hours or more with a meal break.

### 4. *West Point Loma Boulevard Starbucks Store Manager*

Stacey S. testified she was the current manager of the West Point Loma Boulevard store (where Carrington previously worked, under different management). Stacey testified that partners who work more than five hours without a meal break are entitled to premium pay. She testified that employees are expected to clock out promptly.

---

10     In his expert report, Starbucks's expert stated that, as part of his analysis, he also ran the same analysis with a shift duration of five hours, one minute (5:01) to five hours, ten minutes (5:10) and "confirmed [his] conclusions and opinions in this report do not change."

14

However, she was aware of instances (not under her management) in which a partner for "personal reason[s]" stayed past the five-hour mark without clocking out either to go home or for a meal break. She emphasized that such instances were "not very common."

C. *Trial Court's Determination of Liability*

Based on the testimonial and documentary evidence admitted at trial, the court found Carrington had established she individually suffered at least two meal period violations. While the violations were minimal, they were ascertainable, and because they were ascertainable, the de minimis exception should not apply. The court found that Carrington had established a representative claim primarily through the testimony of Maryann, whom Starbucks had designated as its person most knowledgeable on the practices at issue, and whom the court found to be credible.

D. *Penalty Phase*

Following the liability phase, the court accepted the parties' briefing on penalties. Plaintiff argued penalties ranging from $25 to $75 per violation were appropriate and requested the imposition of nearly $70 million in total penalties, over $25 million of which was attributable to plaintiff's section 512 and 226.7 claims. Starbucks argued that the evidence at trial demonstrated "exemplary meal break compliance" and emphasized the trial court had found only "greatly minimal" violations; as such, only a minimal penalty—no more than $200,000—should be imposed.

In its tentative assessment of the penalty, the court emphasized that Starbucks's violations were minimal and Starbucks attempted full compliance with California's meal period requirements. Nonetheless, the court found penalties were warranted for the

15

violations that Carrington established.  Rather than imposing the full penalty of $50 per violation, which the court noted in this instance would be unjust, arbitrary, and oppressive, the court imposed a penalty of only $5 per violation.  Noting that plaintiff's and defendant's experts found similar instances of violations, the court found approximately 30,000 violations had occurred and imposed a penalty of $150,000.  The court declined to impose penalties for the additional statutory violations plaintiff had pleaded.

E. *Judgment*

After issuing a statement of decision, the court entered judgment in favor of Carrington both in her individual and representative capacities and assessed a total penalty of $150,000 against Starbucks, with 75 percent of that amount to be paid to the LWDA and the remaining 25 percent to be paid to the aggrieved employees, consistent with section 2699, subdivision (i).  The court indicated costs and fees would be determined by subsequent motion.

IV. *Appeal*

Starbucks filed the current appeal.  Carrington subsequently filed a cross appeal. The appeals were consolidated, but the parties later stipulated to the dismissal of Carrington's cross appeal.  As such, only Starbucks's challenges to the judgment remain.

Starbucks argues that it demonstrated "comprehensive meal break policies and practices that exceed the requirements of California law," that Carrington "overwhelmingly" took compliant breaks and has "no evidence" of meal break violations, and that the data reflecting other aggrieved employees likewise demonstrates "exemplary

16

meal break compliance."  Starbucks contends the judgment should be reversed because Carrington failed to prove she is an aggrieved employee and failed to prove a representative claim.

DISCUSSION

I.    *Applicable Law*

A.  *Standard of Review*

"[I]n reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]' [Citation.]  In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]'  [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.  [Citation.]" (*Estate of Young* (2008) 160 Cal.App.4th 62, 75-76; accord, *Sav–On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 [" 'questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve' "].)

We "start with the presumption that the record contains evidence sufficient to support the judgment; it is the appellant's burden to demonstrate otherwise." (*Baxter*

*Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368.) As such, the appellant is required to provide a summary of all of the evidence, not merely his or her own evidence, with citations to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark Corp.*).)[11]

"Questions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo. [Citation.]" (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604.)

B. *PAGA*

"Under the Labor Code, the [LWDA] and its constituent departments and divisions are authorized to collect civil penalties for specified labor law violations by employers. [Citation.] To enhance the enforcement of the labor laws, the Legislature enacted PAGA in 2003." (*Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 216 (*Home Depot*).) In doing so, the Legislature "declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market,

---

[11] Starbucks neglected to include in the record (among other things) a copy of plaintiff's expert's declaration. Carrington argued this evidence lent significant support to the judgment and Starbucks's failure to include it justified dismissal of the appeal. Starbucks responded that this argument is "frivolous" and the evidence is "not relevant," although Starbucks included its own expert's declaration in the record. While we decline to dismiss the appeal, we find that, in failing to include these documents in the appellate record and in failing to recognize evidence adduced at trial unfavorable to its arguments on appeal (as discussed further, *post*), Starbucks did not fully comply with California Rules of Court, rule 8.204(a)(1)(C).

and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain primacy over private enforcement efforts." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980 (*Arias*).)

Under PAGA, "an 'aggrieved employee'—a person affected by at least one Labor Code violation committed by an employer—[may] pursue penalties for all the Labor Code violations committed by that employer." (*Huff v. Securitas Security Services USA, Inc*. (2018) 23 Cal.App.5th 745, 751 (*Huff*).) Previously, such civil penalties could be collected only by the LWDA. (*Home Depot*, *supra*, 191 Cal.App.4th at p. 216.) Seventy-five percent of any penalties collected by a PAGA representative are distributed to the LWDA, while the remaining 25 percent are distributed to the aggrieved employees. (§ 2699, subd. (i).) Because PAGA allows a representative plaintiff to recover civil penalties on behalf of the state, "[a] PAGA representative action is . . . a type of qui tam action." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 382.) Statutory class action requirements are not applicable to PAGA claims. (*Arias*, *supra*, 46 Cal.4th at p. 975.)

C. *California Meal Break Requirements*

"An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee." (§ 512, subd. (a).) An employer who fails to provide a required meal break

19

"shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal . . . period is not provided." (§ 226.7, subd. (c).) "[A]n employee is entitled to the additional hour of pay immediately upon being forced to miss a . . . meal period." (*Murphy v. Kenneth Cole Productions, Inc*. (2007) 40 Cal.4th 1094, 1108.)

An employer's obligation to provide a meal period to its employees is satisfied "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1040 (*Brinker*).) "[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed. Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations, and work by a relieved employee during a meal break does not thereby place the employer in violation of its obligations and create liability for premium pay . . . ." (*Id*. at pp. 1040-1041.) However, "if the employer knows that meal breaks are missed, shortened, or unduly delayed because the employer has instructed the employee to work, or has otherwise impeded the taking of breaks, [the employer's] duty is contravened, absent a suitable waiver or agreement by the employee." (*Safeway, Inc. v. Superior Court* (2015) 238 Cal.App.4th 1138, 1155.) "[U]nder those circumstances, the employee is 'immediately' entitled to the premium wage, without any demand or claim to the employer . . . ." (*Ibid*.)

An initial violation of these meal period requirements subjects the employer to a civil penalty of $50 "for each underpaid employee for each pay period for which the

employee was underpaid in addition to an amount sufficient to recover underpaid wages."

(§ 558, subd. (a)(1); *Brewer v. Premier Golf Properties, LP* (2008) 168 Cal.App.4th

1243, 1253-1254 [§ 558 establishes penalties for employers violating meal and rest break

requirements]; *Thurman v. Bayshore Transit Management, Inc*. (2012) 203 Cal.App.4th

1112, 1152-1153 (*Thurman*) [§ 558 sets forth civil penalties for missed rest periods].)

II.     *Carrington Proved She Is an Aggrieved Employee*

Starbucks contends that Carrington failed to demonstrate she is an aggrieved

employee with an individual claim.  Starbucks asserts three, related arguments:

(1) Carrington never experienced the "specific violation" she alleges; (2) Starbucks

provided her the requisite breaks; and (3) the alleged violations were de minimis and thus

not actionable.  We conclude all these arguments lack merit.

A.  *Carrington Experienced the Violation Alleged*

Carrington's time records established that on November 2, 2013 and December 22,

2013, she worked more than five hours without taking a meal break and did not receive a

premium payment.  Although Carrington admitted she did not remember the details

surrounding those shifts, she testified that she accurately recorded her work time while

employed at Starbucks; she was required to obtain approval from her supervisor prior to

beginning her meal break; she never refused to begin a meal break when instructed to do

so; and once instructed to start a meal break, she would "immediately" punch out to start

the break.  This is substantial evidence supporting the trial court's conclusion that

Starbucks did not provide Carrington meal breaks as required by law in these instances.

(*Estate of Young*, *supra*, 160 Cal.App.4th at pp. 75-76.)

21

Starbucks insists that Carrington never suffered the "specific violation" alleged in her complaint and at trial. According to Starbucks, "Carrington repeatedly made clear before trial that she sought to challenge Starbucks'[s] purported 'policy' of refusing to pay a premium in one situation: when partners are scheduled to work five hours or less but unexpectedly work slightly longer without taking a meal break." Starbucks contends Carrington did not experience this specific violation—because for the one shift she worked more than five hours without ever taking a meal break, she was paid a premium, and for the two other shifts in which she worked more than five hours, she *did* take a meal break (albeit late, after the start of her fifth hour of work). Starbucks also points out that, on these latter two occasions, Carrington was originally scheduled to work shifts longer than five hours, and as such should have been scheduled to take a timely break; Starbucks contends these shifts are thus outside of the violation she has alleged.

Starbucks's argument fails because it does not accurately describe Carrington's claims. As authority for its position that Carrington's "theory concerns only certain shifts in which a meal break is 'never provided,' " Starbucks cites Carrington's trial brief, in which she stated, "Ms. Carrington alleges that on specific—and *limited*—work shifts, Starbucks'[s] uniform policies and practices violate [sections] 226.7 and 512, among other statutes. For example, it is undisputed that (1) Starbucks *never* schedules (and thus never 'provides') a meal period for its employees who are scheduled to work a shift of 5 hours or less, and (2) where the referenced employee *actually* works 'slightly more' than 5 hours, no meal period is ever scheduled, and no meal period penalty is ever provided to the impacted employee." In another portion of her trial brief, Carrington stated, "The

primary issue is whether Starbucks'[s] practice (including its verified policies) of refusing to provide either (1) timely meal periods or (2) meal period premiums, is illegal. For example, Starbucks admits to possessing a written policy where store partners who (a) were *scheduled* by Starbucks to work '5 hours or less,' but (b) *actually* worked 'slightly more than 5 hours,' are not provided a meal period, or a meal period premium." When read in context of the entire case, these statements cannot be construed so narrowly as to exclude Carrington's claimed violation that on two occasions she received a late meal period without being paid a meal period premium.

The operative complaint averred that California law prohibits an employer from employing an employee for a work period of more than five hours a day without providing the employee with a meal period, and that an employer who fails to provide the meal breaks "as required" must pay the employee the premium payment. The complaint further averred that "employees were denied the protections and benefits of the Labor Code and IWC Wage Order(s) due to Defendant's standard practices," that "Defendant possessed (and possesses) a Meal Period Policy which affirmatively states that a Meal Period Payment will not be administered where an employee works 'slightly more' than 5 hours without being provided a meal period," and that Starbucks's "institutional and established practices . . . are illegal, in that Plaintiff and all other aggrieved *employees were denied proper and/or timely meal periods and/or meal period payments*." (Italics added.) The operative complaint identifies the following common issues: "Whether [Starbucks] failed to provide its employees with statutorily-compliant meal periods in violation of, *inter alia*, . . . section[s] 510 and 226.7, in that [Starbucks's] written policies

23

are not compliant with California law" and "[w]hether [Starbucks] failed to properly provide meal period premiums in accordance with the law." Carrington's PAGA letter to the LWDA similarly stated, "Starbucks failed to comply with . . . sections 226.7 and 512, in that it possessed (and possesses) a Meal Period Policy which affirmatively states that a Meal Period Payment will not be provided where an employee works 'slightly more than 5 hours.' This policy/practice violates California law, as confirmed in *Brinker v. Superior Court*, because *it fails to provide a Meal Period prior to the end of an employee's first five hours* of employment." (Italics added.)

Considering the allegations in the complaint along with the statements in the PAGA letter and trial brief together, we are not persuaded by Starbucks's claim that Carrington's action is limited strictly to employees who were originally scheduled to work shifts of five hours or less. The claims reasonably encompass employees who, like Carrington, worked slightly more than five hours without being provided a timely meal break or paid a meal period premium. There was sufficient evidence at trial that Carrington experienced one of the violations she alleges because she was twice provided meal breaks after more than five hours of work. Provision of a late meal period does not satisfy California's meal period requirements: "[A]bsent waiver, section 512 requires a first meal period *no later than* the end of an employee's fifth hour of work . . . ." (*Brinker*, *supra*, 53 Cal.4th at p. 1041, italics added.) Provision of a meal period *later than* the end of Carrington's fifth hour of work thus violates section 512 and triggers the employer's obligation to pay a meal period premium under section 226.7, subdivision (b).

24

We therefore reject Starbucks's contention that Carrington did not suffer the "specific" meal break violation she alleged in her complaint or at trial. Carrington's complaint was not limited to a single type of violation—it instead can fairly be construed to encompass both late meal breaks and the failure to provide meal break premiums. The fact that she experienced a violation that may differ from other employees does not bar her claims here. (*Huff*, *supra*, 23 Cal.App.5th at p. 750 [an aggrieved employee who brings a representative PAGA action "may seek penalties not only for the Labor Code violation that affected him or her, but also for different violations that affected other employees"].)

B.  *Starbucks Did Not Provide Compliant Meal Breaks*

Starbucks next argues that the evidence at trial showed that Starbucks made proper breaks available to Carrington, satisfying its obligation to *provide* a meal break, even if Carrington neglected to timely take it. Although Starbucks correctly notes it was not required "to police meal breaks and ensure no work thereafter is performed" (*Brinker*, *supra*, 53 Cal.4th at p. 1040), we reject Starbucks's claims that it satisfied its obligation here.

In arguing that it complied with its obligation to provide compliant breaks, Starbucks ignores the evidence adduced at trial unfavorable to its position, which supports the trial court's conclusion to the contrary. (*Foreman & Clark Corp.*, *supra*, 3 Cal.3d at p. 881 [Defendants arguing that " 'some particular issue of fact is not sustained . . . are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be

25

waived.' "].)  Carrington testified that when the store was busy and coverage was needed, at her supervisor's request she would work past the end of her scheduled shift "a lot of times."  She was not permitted to start her break until she received approval from her supervisor, and she would immediately punch out once her supervisor instructed her to start her meal break.  This testimony, coupled with Carrington's time records demonstrating she twice worked shifts in excess of five hours without a timely meal break and without payment of a meal period premium, is substantial evidence to support the trial court's conclusion that Starbucks did not provide Carrington with a meal break or the required premium payment on at least two occasions.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1040 [employer may not "impede or discourage" employees from taking compliant meal breaks].)

C. *The De Minimis Doctrine Does Not Preclude Liability Here*

Starbucks contends the violations Carrington experienced were so brief that they are not actionable, and Starbucks should be entitled to judgment.  Our Supreme Court recently rejected Starbucks's de minimis rule argument, albeit in a different context, in *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829 (*Troester*).  In that case, the Supreme Court held that California law does not permit application of the de minimis rule where the employer required the employee to work " 'off the clock' " several minutes (in that case, four to 10 minutes) per shift.  (*Id*. at p. 835.)  However, *Troester* explicitly left open the question of "whether there are wage claims involving employee activities that are so irregular or brief in duration that employers may not be reasonably required to

26

compensate employees for the time spent on them." (*Id*. at p. 848.) Starbucks argues this is just such a case. We disagree.

In *Troester*, the court recognized that "one of the main impetuses behind the de minimis doctrine in wage cases is 'the practical administrative difficulty of recording small amounts of time for payroll purposes.' " (*Troester*, *supra*, 5 Cal.5th at p. 848.) On this record, however, there is no indication of a practical administrative difficulty recording small amounts of time for payroll purposes. To the contrary, the evidence here indicated that Starbucks's partners' time records accurately reflected partners' start and stop times, including the times they punched in and out for meal breaks. In addition, store managers were trained (1) to talk to partners about any meal periods that were not timely taken; (2) to determine whether a meal break premium should be paid; and (3) to document their findings. The fact that store managers did not consistently follow these practices does not mean it was administratively impossible or impractical to do so. We reject Starbuck's claim that the de minimis doctrine applies here.

III.    *Carrington Proved a Representative Claim*

A. *Substantial Evidence Supports the Conclusion That Starbucks Had a Non-compliant Policy and Practice*

Again relying only on evidence favorable to it, Starbucks contends the evidence adduced at trial established it provided timely meal breaks or premium payments and that Carrington failed to prove a representative claim. We emphasize that it is not our role to reassess credibility or reweigh the evidence; rather, "our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence,

27

contradicted or uncontradicted, which will support the trial court's factual determinations." (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501.) Applying this standard, we conclude the trial court's determination that Carrington established a violation on a representative basis is supported by substantial evidence.

Carrington relied on Maryann, whom Starbucks designated in discovery as its person most knowledgeable, to provide testimony regarding Starbucks's policies and practices regarding meal breaks. Maryann's testimony established that Starbucks utilized a computerized scheduling system to schedule partners' shifts. The system automatically scheduled meal breaks to begin prior to the start of the partner's fifth hour of work, but only if the partner was scheduled for a shift in excess of five hours. For partners scheduled to work exactly five hours or less, a meal break would not be pre-scheduled. Starbucks did not permit partners to waive their meal period.

In instances where partners worked in excess of five hours but a meal break was not pre-scheduled, partners relied on their managers or supervisors to provide timely breaks or to subsequently (at the weekly running of payroll) arrange for the payment of a meal period premium. Starbucks's written policies emphasized that payment of the meal period premium was not automatic; the manager must act to pay premiums due. Maryann and Dora both confirmed the managers are the ultimate decision-makers delegated authority to determine whether a meal break is provided and whether a premium is paid. Partner payroll records demonstrated that, in the vast majority of instances where a partner worked an initial or total shift in excess of five hours but shorter than five and a quarter hours (such that they were not provided a timely meal

28

break), they were not paid the meal period premium. Indeed, plaintiff's expert concluded that meal period premiums were unpaid in approximately 76 percent of these instances; defendant's expert concluded that meal period premiums were *paid* in approximately 26 percent of these instances (and were thus *unpaid* in approximately 74 percent of these instances). Altogether, this is substantial evidence to support the conclusion that Starbucks's policies and practices resulted in numerous instances in which employees working "slightly more" than five hours were neither provided meal breaks nor paid meal period premiums, in violation of the law.

We likewise conclude that Starbucks has not established legal error. "[S]ection 512 requires a first meal period no later than the end of an employee's fifth hour of work . . . ." (*Brinker*, *supra*, 53 Cal.4th at p. 1041.) The trial court recognized that the violations occurred in only a narrow circumstance and described the violations as "minimal." Nonetheless, the trial court properly concluded that the failure to provide timely meal breaks or pay meal period premiums to employees working shift durations slightly in excess of five hours violated California's meal break requirements. (§§ 226.7, 512.)

B. *The Evidence Was Not Overly Individualized to Preclude a Representative Finding*

Starbucks contends Carrington's experience was individualized, emphasizing that she worked with several other untrained, new employees in a newly opened store that was run "haphazardly" by the then-manager. As such, Starbucks contends, her experience cannot support the finding of a violation on a representative basis. Because

29

this was a PAGA action, Carrington was not required to fulfill strict class action procedural requirements. (*Arias*, *supra*, 46 Cal.4th at p. 975.) Nonetheless, Carrington's primary evidence, provided through Starbucks's written policies and the testimony of a witness Starbucks designated as the one most knowledgeable on the subject, established that generally applicable corporate policies and procedures resulted in numerous employees with initial or total shifts slightly in excess of five hours not being provided with timely meal breaks and not being paid meal period premiums, in violation of the law. This case is thus distinguishable from *South Bay Chevrolet v. General Motors Acceptance Corp*. (1999) 72 Cal.App.4th 861, 897, where plaintiff's PAGA claim failed because the evidence showed defendant's practices "were not sufficiently uniform to allow representative treatment." For this reason and for the reasons previously discussed, we conclude substantial evidence supports the judgment on Carrington's representative claim.

C. *Starbucks Has Not Established Prejudicial Error with Respect to the Time Records*

Starbucks also challenges Carrington's reliance on time records, contending these records were used improperly to establish meal break violations. In support of this argument, Starbucks cites a number of federal district court cases concluding that time records alone cannot establish why breaks were taken late. (E.g., *Manigo v. Time Warner Cable, Inc*. (C.D.Cal. Oct. 17, 2017, No. CV 16-06722-JFW (PLA)) 2017 WL 5054368 [concluding time records alone are insufficient to create a material factual dispute regarding meal period compliance, as they do not indicate why the breaks were taken];

30

*Roth v. CHA Hollywood Medical Center, L.P.* (C.D.Cal. Oct. 25, 2013, No. 2:12-CV-07559-ODW) 2013 WL 5775129 [denying class certification under the federal rules of procedure where plaintiff failed to establish the existence of common questions of liability through common evidence].)  Here, however, partner time records were not used to establish why breaks were taken late.[12]  Rather, as discussed *ante*, Carrington provided evidence to establish that breaks were taken late (or not at all) as a result of Starbucks's policies and practices of not automatically scheduling a break or premium payment for initial shifts with a duration of five hours and relying on managers to either schedule meal breaks or pay meal period premiums when employees scheduled to work less than or exactly five hours ultimately worked slightly longer.  The time records were used in conjunction with this other evidence to allow the trial court to quantify potential violations and in turn devise an appropriate penalty.[13]  We thus reject Starbucks's contention that the trial court erred by relying exclusively on the payroll records to establish liability.

Starbucks further contends that the time records cannot be used to establish a rebuttable presumption that violations occurred.  (But see *Brinker*, *supra*, 53 Cal.4th at p. 1053 (conc. opn. of Werdegar, J.) ["If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not

---

12    There is no dispute that the time records do not indicate why a break was missed or taken late.  Both parties' experts testified they were unable to discern from the data why a break was taken late or not at all.

13    Starbucks does not challenge the penalty imposed.

relieved of duty and no meal period was provided."].) Starbucks argues that the rebuttable presumption discussed in Justice Werdegar's concurring opinion in *Brinker* "is not the law" because a concurrence " 'is not binding precedent.' " Even if the presumption discussed in Justice Werdegar's concurrence is not binding precedent, as Starbucks argues, it may nonetheless be persuasive, providing guidance to trial courts in certain circumstances.[14] (See *People v. Barba* (2013) 215 Cal.App.4th 712, 734, fn. 7.) Nonetheless, because plaintiff here established the existence of Starbucks's noncompliant meal period practices primarily through Starbucks's written policies and Maryann's testimony, and not primarily with time records, we decline to determine the nature or effect of any rebuttable presumption that might be created by such time records.

Starbucks alternatively argues that, even if the time records could establish a presumption that violations occurred, it rebutted that presumption by proving that employees skipped or delayed breaks for personal reasons. In support of this argument, Starbucks cites testimony of Maryann, Dora, and Stacey, each of whom offered testimony that an employee might "choose" to work past the start of their fifth hour "for personal reasons," such as making a partner beverage, using the bathroom, or talking to a customer. Maryann testified hypothetically that a partner might be scheduled to work exactly five hours, and before clocking out, choose to make a partner beverage, resulting

---

[14]    Starbucks itself cites in its opening brief on appeal to no fewer than 30 federal district court opinions, most of which were not published in a federal reporter, and which, "at best," may be described as persuasive. (*Castaneda v. Department of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1074 [" 'a decision of a federal district court has no precedential value in this court; at best, it is persuasive authority only' "].)

in clocking out a minute or two late.  "So that could be an example of where the partner would . . . 'agree to not be paid a penalty and/or take a break.' "  Dora, the partner resources manager, similarly testified to a hypothetical scenario where a partner's choice to make a partner beverage prior to clocking out would result in a shift in excess of five hours that she claimed would not warrant a premium payment.  Stacey, the store manager, testified anecdotally that she had seen this happen:  "So if somebody is asked to clock out and they choose to use the restroom or make themselves a beverage or, you know, are chatting with a customer" they might work longer than five hours.  Stacey emphasized that this was "not very common" and did "not [happen] often."  We cannot agree with Starbucks that this testimony, which is more conjecture than evidence, constitutes proof that employees actually skipped or delayed breaks for personal reasons, sufficient to rebut the violations established by plaintiff.

Moreover, Carrington was not required to show that Starbucks's policies *universally* precluded employees from taking *all* meal breaks.  What is required—and what Carrington established here—is that Starbucks's generally applicable policies resulted in noncompliance with meal period requirements.  (See *Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 409 [noting in discussion of class certification requirements that "*Brinker* . . . does not require [claimants] to establish the universal application of an allegedly illegal policy; rather, a [claimant] need only show a 'consistent[]' application of the policy"]; accord *Faulkinbury v. Boyd & Associates, Inc*. (2013) 216 Cal.App.4th 220, 235 [Noting in the class certification context that "the employer's liability arises by adopting a uniform policy that violates the wage and hour

33

laws. Whether or not the employee was able to take the required break goes to damages . . . ."].)

D. *Starbucks Was Not Precluded from Presenting Its Defenses*

Starbucks argues that the trial court effectively required it "to prove the specific circumstances of each of the roughly 30,000 shifts in the time records that could *potentially* be violations." This, Starbucks contends, violates due process and strips it of its right to present a defense. But Starbucks cites no record evidence provided at trial (other than the anecdotal or hypothetical references mentioned *ante*) to establish that *any* partner shifts worked in excess of five hours without a break were worked for personal reasons, such that payment of the meal period premium was not required. Nor does Starbucks argue it sought to introduce evidence that was excluded or disregarded by the trial court. As such, we find no basis to support Starbucks's claim that it was deprived of due process because it did not have the opportunity to present defense evidence.

E. *Starbucks's Good Faith Attempt to Comply with the Law Is Reflected in the Penalty Imposed*

Although the trial court may have disagreed with Starbucks regarding the issue of liability, it clearly took the circumstances proffered by Starbucks into consideration when it imposed the penalty, as evident from the significant reduction of the $50 maximum penalty (per initial violation) to the penalty imposed—only $5 per initial violation. The trial court stated this reduction was warranted because imposing the maximum penalty would be unjust, arbitrary, and oppressive based on Starbucks's "good faith attempts" to comply with meal break obligations and because the court found the violations were

34

minimal. As the court in *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1213 recognized, the trial court may "exercise its discretion *to award lesser penalties based on the enumerated considerations*" in section 2699, subdivision (e)(2), which include a determination that imposition of the maximum statutory penalty would result in an award that is unjust, arbitrary, oppressive, or confiscatory. (Accord *Thurman*, *supra*, 203 Cal.App.4th at p. 1136 [affirming trial court's 30 percent reduction of maximum penalty].)

## DISPOSITION

The judgment is affirmed. Carrington is entitled to costs on appeal.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

35

Filed 12/19/18

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KILEIGH CARRINGTON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STARBUCKS CORPORATION,<br><br>    Defendant and Appellant. | D072392<br><br><br><br>(Super. Ct. No. 37-2014-00018637-CU-OE-CTL)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed November 27, 2018, was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties

2