Filed 11/27/24  Jose P. v. Superior Court CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JOSE P., | B340470 |
| Petitioner, | |
| v. | (Los Angeles County Super. Ct. No. 24CCJP01207A) |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mary Kelly, Judge.  Petition denied.

Los Angeles Dependency Lawyers, Law Office of Amy Einstein, Dominika Campbell, and Tzivia Bowman for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Real Party in Interest Los Angeles County Department of Children and Family Services.

Children's Law Center of California, Taylor Lindsley, for Minor J.P.

_____

Jose P. (father) filed the present petition for writ of mandate from the juvenile court's order setting a Welfare and Institutions Code[1] section 366.26 hearing to terminate parental rights. Father contends that substantial evidence did not support the juvenile court's finding that father sexually abused his daughter, J.P., within the meaning of section 300, subdivision (d). We conclude that substantial evidence supported the juvenile court's finding, and thus we deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

J.P. (born in January 2008) is the child of father and Claudia M. (mother). Mother and father divorced in 2013, when J.P. was five years old. Mother and J.P. moved to Tempe, Arizona in 2018, and mother died in late 2021. After mother's death, J.P. lived with a maternal aunt in Arizona for about a year, and then moved back to California in 2023 to live with father.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

## I.      Prior reports of abuse.

In May 2018, the Los Angeles County Department of Children and Family Services (DCFS) received a report that J.P. and her siblings did not want to visit father because he was verbally and emotionally abusive. J.P. was particularly upset about visiting father because he insisted that she and her brothers sleep with him in his bed. The referral was closed as unfounded and inconclusive.

In August 2018, DCFS received a report that father touched J.P. inappropriately. J.P. said father touched her on her arms, stomach, and back, and when she asked him to stop, he laughed and said her body belonged to him because he made her. The report was closed as unfounded.

In April 2019, J.P. made two reports about father, including that she had to sleep in the same room with father and that he was emotionally abusive. DCFS closed the referral as inconclusive, and noted that mother had an upcoming hearing to modify the existing family court order.

In September 2021, the family court found that mother had refused to follow prior visitation orders, and it granted father primary physical custody of J.P.. The same month, mother reported to police that father had molested J.P. between 2013 and 2018. Mother said J.P. reported the abuse to her in 2018, when J.P. was ten years old. J.P. told a police officer that after her parents separated, she visited father every other weekend. During those visits, father would grab her breasts, buttocks, and vagina, both over and under her clothes. On three occasions, father put his finger inside J.P.'s anus as a punishment for having pushed him away when he was trying to touch her. On several occasions, father kissed J.P. on the mouth and neck while

3

lying on top of her in his underwear. J.P. said the sexual abuse continued until she and mother moved to Arizona when she was ten years old. J.P. said she had not previously reported the abuse because father had put a gun to her head and threatened to kill her and mother if she told anyone about it. She eventually told mother about the abuse when she was ten years old, and she was reporting it to the police now because father had recently petitioned the court for custody. The report was closed as unsubstantiated.

Mother was reported missing in November 2021. In February 2022, it was discovered that mother had been murdered.

## II. Petition and detention.

In April 2024, DCFS received a report that 16-year-old J.P. had locked herself in her room after an incident with father. She reported that she feared father, was hyperventilating, and was suicidal. She was admitted to the hospital on a mental health hold, and the following day DCFS received a report that J.P. had disclosed sexual abuse by father.

J.P. told a social worker that she had lived with mother until her death in 2021. J.P. lived with maternal aunt Angelica M. from 2022 to 2023, and with father since 2023. J.P. said father was verbally and emotionally abusive, and had groped her breasts, buttocks, and vagina from about 2013 to 2018.

Father denied yelling at J.P. or touching her sexually. He believed J.P. was mentally ill because mother " 'fucked her up' and put negative thoughts and influences in [her] head."

J.P.'s adult brother, Jose Jr., said father and J.P. argued, but he had never witnessed any physical or sexual abuse. He

4

believed J.P. had mental health issues and was still grieving mother's death.

J.P. told the social worker she was scared of father and did not want to be discharged to his home because she feared he would continue to hit her and touch her inappropriately.  She said father yelled and cursed at her, used racial slurs, and "would push physical boundaries by 'touching, poking, tapping and patting me all over my body even when I tell him to stop.' "  She also said that when she was ten or eleven years old, father had groped her breasts and touched her vagina over and under her clothes.  She had been afraid to report the abuse because father had threatened her and mother.  J.P. said she wanted nothing to do with father and feared for her life if she returned to his home.

Maternal aunt Angelica said she had not been concerned about J.P.'s mental health when J.P. lived with her after mother's death.  J.P. had told Angelica she was unhappy living with father because he yelled, disparaged mother, and said mother deserved to die.  Angelica was aware that J.P. had previously reported sexual abuse by father, for which J.P. had seen a therapist.  Angelica was unsure of the details of the sexual abuse, which she had not witnessed but had heard about from mother.  Angelica had seen father " 'flick' " and " 'poke' " J.P.'s head, and had heard him call J.P. "stupid."

J.P.'s therapist said she had worked with J.P. for only four months and had suspicions that J.P. was hiding possible past abuse.  The therapist said J.P. seemed fearful of disclosing anything and had appeared " 'more scared' " in the past week.  J.P. had disclosed feeling uncomfortable around father and had told the therapist that " 'I don't like to be touched by Father.' "

J.P.'s middle school counselor in Arizona said J.P. feared father and had disclosed that father touched her inappropriately. The counselor suspected physical or sexual abuse, but J.P. had never been specific enough to justify a child protective services report. The counselor said that when J.P. was in middle school in Arizona, she had good grades and attendance, and was happy and active in school activities.

J.P.'s high school Spanish teacher said J.P. appeared sad and anxious but had never disclosed any abuse. Family friend Jessica R. said she was unsure whether J.P. had been sexually abused, but she had seen father " 'flick and poke' " J.P. on her stomach, thighs, and head. She described father as very manipulative and controlling of J.P..

On April 12, 2024, J.P. told the social worker that she was fearful of being discharged to father, wanted to run away from home, and would feel safer homeless than with father. She also said she had thoughts of suicide and self-harm because of father. Father agreed to allow J.P. to be discharged to his sister, J.P.'s paternal aunt, for a short time.

On April 16, 2024, father called the social worker to say that J.P. was refusing to get into his car to go to school. J.P. ultimately left for school with father after he threatened to call the police. The same day, J.P.'s school called the social worker to say that J.P. feared for her own life if father forced her to leave school with him. The social worker served father with an immediate removal order, and J.P. was released to a maternal relative.

On April 18, 2024, DCFS filed a petition alleging J.P. was a juvenile court dependent pursuant to section 300, subdivisions (b), (c), and (d). Specifically, the petition alleged

6

that father sexually abused J.P. by fondling her breasts, buttocks, and vagina; digitally penetrating her anus; kissing her neck and mouth while lying on top of her in his underwear; and threatening to kill mother if J.P. disclosed the abuse (counts b-1, d-1).  The petition also alleged that father emotionally abused J.P. by yelling and cursing at her, calling her derogatory names, including racial slurs, and speaking negatively about her deceased mother, all of which caused J.P. to suffer depression and suicidality and to engage in self-harming behaviors (count c-1).  The same day, the juvenile court detained J.P. from father and ordered her placed with maternal relatives under DCFS supervision.

### III.  Jurisdiction and disposition.

In May 2024, J.P. repeated her statements to the social worker that father had sexually abused her from ages five to ten years old.  She said the abuse happened when she was alone with father in his house after her parents separated, and occurred during every visit.  She said the abuse included touching her breasts and buttocks over her clothes; cupping and squeezing her vaginal area; inserting his finger in her anus; pulling her toward him when she was half-dressed and saying, " 'You are mine and I own you' "; kissing her on the neck and mouth, including with his tongue; and lying next to her with only his underwear on and caressing her.  J.P. also said that when she was in third grade, father pointed a gun at her head and threatened to hurt her and mother if she disclosed the abuse.  J.P. said that as she got older, she realized that what father was doing was wrong, and she would ask him not to touch her or would try to pull away from him.  However, father would prevent

7

her from moving away while telling her that he was " 'God,' " and he could do anything to her because he owned her.

J.P. said the abuse stopped when she was ten years old, after she had surgery and spent several weeks in the hospital. While J.P. was hospitalized, mother told her that father wanted to spend the night at the hospital to look after her. J.P. broke down and disclosed the sexual abuse. Mother made a police report, and until mother's death, J.P. never returned to father's home or had unsupervised contact with father. Mother enrolled J.P. in therapy, through which J.P. had been processing the sexual abuse, her parents' separation, and later, her mother's death.

J.P. said father had not abused her sexually since she moved back in with him, but he constantly disparaged her, mocking her dark skin color and her weight. When she was younger, he had encouraged her to hurt or kill herself. More recently, he had mocked mother, saying he was happy she was dead and that she deserved to be murdered. J.P. said she felt safe and emotionally supported in her current placement with her maternal aunt.

Father denied all of J.P.'s allegations. He said mother had coached J.P. to lie in order to gain full custody of her, and a family law court had found the allegation of sexual abuse to be untrue in 2021. J.P.'s brother and paternal aunts also denied that father had ever emotionally or sexually abused J.P.

DCFS recommended sustaining the allegations of the petition. While DCFS acknowledged that many extended family members denied any abuse, J.P. had been consistent in her reports of abuse over several years. DCFS further recommended that J.P. remain in her current placement and that father be

ordered to participate in individual counseling, a parenting class, a sexual abuse awareness program, an anger management class, and family counseling.

In July 2024, DCFS conducted a forensic interview of J.P. in which she detailed father's sexual and emotional abuse. During that interview, J.P. disclosed that father had "caress[ed] his body on [her]" by pushing his crotch against her chest and holding her arm to keep her from moving away from him; grabbed her crotch; put his fingers in her anus; caressed her bare breasts after she showered; and threatened to kill J.P. or mother if she disclosed the abuse. DCFS also obtained a recording of a 2021 forensic interview of J.P. conducted in Arizona, which was consistent with her 2024 report.

At the August 29, 2024 jurisdiction and disposition hearing, father's counsel asked that the petition be dismissed. Counsel urged there was no substantial evidence that any sexual abuse occurred because father denied the allegations, no one witnessed the alleged abuse, and the allegations were deemed unfounded by DCFS in 2018 and in the Arizona investigation; and, in any event, by J.P.'s own account the last incident of sexual abuse was six years earlier. Counsel also urged that J.P. was not suffering serious emotional damage within the meaning of the statute because J.P.'s psychiatric hospitalization was an isolated incident and she denied current suicidality. Counsel urged that if J.P. was suffering serious emotional damage, it was due to her mother's death, not any conduct by father.

Minor's counsel asked the court to sustain the petition. Counsel noted that J.P. had been consistent in her reports of sexual abuse, first disclosing the abuse to her mother when she was ten years old. Counsel urged that the recent forensic

9

interview was very suggestive of sexual abuse: "Look at her body language. She is very closed off. She is emotional. She is clearly traumatized when speaking about the abuse which further adds to her credibility." Counsel further contended that the notion that J.P. had been coached by mother was not persuasive as mother had been dead for several years.

The juvenile court sustained the petition in its entirety. The court noted it was not bound by factual findings in other proceedings and, having evaluated the evidence independently, the court credited J.P.'s statements and disbelieved father's. The court explained: "I believe that there is more than a preponderance of the evidence. And I credit the minor's statements over the statements of the father. . . . This was [eg]regious behavior on the part of father, in my view. And I believe there is more than ample evidence. [¶] I credit the statements of the [minor] [that] she was penetrated. That father . . . inappropriately groped her with his own penis [in-]between her breasts over her clothing. I credit everything she said. [¶] I watched that video and I believe she was credible . . . . [¶] . . . [¶] . . . On that basis I do find that the child is a person described by section[ ] 300, subdivisions [(b), (c), and (d)]."

The court then noted that it was considering a bypass of reunification services and would grant a continuance to give father a chance to respond. Father's counsel requested a brief recess, during which father signed a written waiver of reunification services. The juvenile court advised father that if he waived reunification services, his parental rights could be terminated, and father said he understood. The court then made a finding that father had knowingly and intelligently waived his

10

rights to reunification services and set a hearing pursuant to section 366.26 for January 2, 2025.

On August 29, 2024, father filed a notice of intent to file a writ petition.

## DISCUSSION

Father's sole contention in this writ petition is that substantial evidence does not support the juvenile court's finding that he sexually abused J.P.[2]  For the reasons that follow, father's contention lacks merit.

Section 300, subdivision (d) provides that a child is within the jurisdiction of the juvenile court if the child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in section 11165.1 of the Penal Code. Penal Code section 11165.1 defines "sexual abuse" to include, among other things, "[i]ntrusion by one person into the genitals or anal opening of another person, including the use of an object for this purpose" and "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification."  (*Id.*, § 11165.1, subds. (a), (b)(2), (4).)  The absence of physical evidence of sexual abuse does not preclude a finding of sexual abuse.  (See *In re L.O.* (2021) 67 Cal.App.5th 227, 241–242; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 137.)

---

[2]    Real parties in interest J.P. and DCFS contend that father's petition is moot because father challenges only one of the three sustained allegations of the petition.  Although we agree that the petition may be moot, we exercise our inherent discretion to consider the petition on the merits.  (See *In re D.P.* (2023) 14 Cal.5th 266, 276–287.)

11

We review the juvenile court's jurisdictional findings for substantial evidence. "Substantial evidence is 'evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof.' (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Under this standard 'we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.' (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) '[T]he trial court's ruling must be upheld if there is any basis in the record to sustain it.' (*People v. Marquez* (1992) 1 Cal.4th 553, 578.)" (*In re J.E.* (2020) 54 Cal.App.5th 309, 313–314.)

Substantial evidence unquestionably supported the juvenile court's section 300, subdivision (d) finding. As early as 2018, and then again in 2021 and 2024, J.P. reported to authorities that father sexually abused her from the time her parents separated in 2013 until J.P. disclosed the abuse to mother in 2018. J.P.'s reports of abuse were detailed and consistent over time: She said that the abuse happened when she and father were alone in his house; that he touched her breasts, vagina, and anus both over and under her clothes; that he put his finger in her anus three times; that he kissed her mouth while lying on top of her in his underwear; and that he said her body belonged to him. In addition to reporting the abuse to police and child protective services, J.P. also disclosed it to mother and to her middle school counselor, and she told her current therapist

12

that she did not like to be touched by father, causing the therapist to suspect sexual abuse. These consistent, repeated reports of sexual abuse unquestionably constituted substantial evidence to support the juvenile court's section 300, subdivision (d) finding.

Father urges that J.P.'s reports of sexual abuse were not credible because two child protective agencies had previously found the allegations to be unsubstantiated, no family member had seen evidence of sexual abuse, J.P. did not reference the alleged abuse in a recorded conversation with father or during her psychiatric hospitalization, and J.P. did not disclose the abuse until father sought custody in 2021. Thus, father urges, "[c]onsidering the parents' decades-old history of making allegations against each other, it is reasonable that [J.P.] learned to exaggerate minor issues . . . to avoid staying with Father."

We are not persuaded. Essentially, father asks us to reweigh the evidence and make credibility findings, which we may not do under the substantial evidence standard of review. (See, e.g., *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996 ["appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence"]; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 824 ["It is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility."].) Instead, where multiple inferences can be drawn from the evidence, we defer to the trial court's findings (*Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 496), and " 'our review begins and ends with the determination as

to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations' " (*Carrington v. Starbucks Corp.* (2018) 30 Cal.App.5th 504, 525).  Because there is competent, substantial evidence that father sexually abused J.P., we could not reverse the juvenile court's findings even if the evidence could also have supported contrary findings.

For the foregoing reasons, we conclude that substantial evidence supported the juvenile court's section 300, subdivision (d) findings, and we therefore deny the writ petition.

**DISPOSITION**

The petition is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EDMON, P. J.


We concur:




EGERTON, J.




ADAMS, J.